LOUISVILLE & JEFFERSON COUNTY METROPOLITAN SEWER DISTRICT et al., Movants,

v.

DOUGLASS HILLS SANITATION FACILITY et al., Respondents.

CITY OF DOUGLASS HILLS et al., Movants,

v.

LOUISVILLE AND JEFFERSON COUNTY METROPOLITAN SEWER DISTRICT et al., Respondents.

Supreme Court of Kentucky.

Dec. 18, 1979.

Marvin J. Hirn, Eric L. Ison, Greenebaum Doll & McDonald, Louisville, for Louisville and Jefferson County Metropolitan Sewer Dist.

Ben J. Talbott, Jr., Middleton, Reutlinger & Baird, Louisville, for Louisville and Jefferson County Bd. of Health.

Valerie F. Fravel, Frankfort, for Com. of Kentucky, Dept. of Natural Resources and Environmental Protection Division of Water Quality.

C. Dant Kearns, James D. Moyer, Stites, McElwain & Fowler, Louisville, for Douglass Hills Sanitation Facility, Inc.

C. Dant Kearns, Louisville, for J. Ed Butler and J. R. Carpenter.

James R. Hynden, Louisville, for Greater Louisville First Federal Savings and Loan Assn.

Carl A. Pallo, Douglas Gene Sharp, James W. Blackburn, Jr., Pallo, White, Monsky & Prizant, Louisville, for City of Douglass Hills, Jerry L. Hartman and Amile L. Harris.

Morris E. Burton, Frankfort, for Com. of Kentucky Public Service Commission.

Glenda J. Beard, Asst. Atty. Gen., Consumer Protection Div., Frankfort, for Com. of Kentucky ex rel. Robert F. Stephens, Atty. Gen.

Bert T. Combs, Richard W. Iler, Tarrant, Combs & Bullitt, Louisville, for Louisville Home Federal Sav. and Loan Assn.

PALMORE, Chief Justice.

This is a declaratory judgment proceeding filed in 1976 by the Louisville and Jefferson County Metropolitan Sewer District (hereinafter MSD) for the purpose of determining, among other things, whether, how, and under what conditions it or some other governmental agency may require a sewer system that presently drains into a sewage-disposal plant owned by Douglass Hills Sanitation Facility, Inc., (hereinafter the Sanitation Company), to be connected instead to MSD's comprehensive sewer and sewage-disposal system.

It was the judgment of the trial court that neither MSD, the Department for Natural Resources and Environmental Protection, the Louisville and Jefferson County Board of Health (hereinafter Board of Health), nor the Public Service Commission may, directly or indirectly, compel abandonment of the Sanitation Company's sewage-disposal plant and connection of the Douglass Hills sewerage system (hereinafter the "collection system," to distinguish it from the sewage-disposal plant) to MSD's system, except through the power of eminent domain. The judgment held also that the collection system is the property of the Sanitation Company and that the City of Douglass Hills and the individual owners of property in that municipality "have no ownership interest therein."

To a very considerable extent the pleadings and the judgment exceed the proper scope of declaratory judgment in that they embrace possible controversies that do not now and may never exist and, in effect, would maneuver the courts into the non-traditional role of supplementing the statutes with an advisory textbook for future use and guidance. This is an area, of course, in which the courts ordinarily must undertake the initiative of guarding their own boundaries for the simple reason that the lawyers in a given case very rarely will raise the issue. Specifically, we reject and eliminate from the case the issue of what the Public Service Commission can or cannot do.

One of the major conclusions of law set forth in the judgment was that if MSD acquires the Sanitation Company's system it cannot assess the cost against the users of the system (whom we shall call the "lot-owners") as is customary when MSD constructs a new sewage-collection system for a particular area.

The Court of Appeals affirmed the judgment except for the conclusion that the lot-owners cannot be assessed for any of MSD's costs in acquiring the existing facilities from the Sanitation Company, should that eventuality occur.

It is our opinion that so long as the Sanitation Company's disposal plant is operated in conformity with applicable orders and regulations of the various governmental agencies, including the Board of Health, having regulatory authority in the premises, and in a manner that is not inconsistent with public health and safety, MSD cannot force the collection system to be diverted to MSD's system without payment of the value of the disposal plant to its owner, the Sanitation Company. We are of the further opinion that in the event MSD should acquire the Sanitation Company's rights by purchase or condemnation no charge may be assessed against the lot-owners for any portion of the cost representing the value of the Douglass Hills collection system. The analysis on which these conclusions rest follows, beginning with a summary of the dispositive facts (which, we might add, are set forth with admirable succinctness and clarity in the judgment of the circuit court) and pertinent statutory provisions.

In May of 1964 MSD adopted a "Master Plan," submitted by consulting engineers, for a comprehensive sewer system throughout Jefferson County. This plan recommended that all existing systems be acquired by MSD "to permit their integration into the county system at the proper time," and it included an estimated cost of such acquisition. It further recommended that during the period of 1965 to 1970 trunk lines be constructed in the area with which we are concerned in this case, that all existing facilities in the county be acquired, and that temporary treatment plants be constructed where required. Again, an estimated cost figure for construction of temporary treatment plants was included, but the plan made no reference to any future construction by private parties.

In December of 1964 a private corporation named Douglass Hills Development Corporation, Inc. (hereinafter "the development corporation"), was organized for the purpose of acquiring and subdividing for residential purposes a 313-acre tract of land on the south side of U.S. Highway 60 near Middletown, in Jefferson County. Contemporaneously, there being no sewage-collection and disposal facilities in the immediate area, the same incorporators organized the Sanitation Company for the purpose of constructing and operating a sewage-disposal plant to serve the subdivision.

Originally, the Sanitation Company intended to build its disposal plant in the 313-acre tract, south of U.S. 60, but at the behest of MSD and other interested parties it was persuaded to locate it across the highway, to the north, so that it might serve the needs of other property in the Middletown area. For this purpose the Sanitation Company bought a small plot of ground from Spring Meadows, Inc. The contract pursuant to which this property was conveyed by Spring Meadows to the Sanitation Company provided as follows (the deed itself did not contain this provision):

"The sewage disposal plant to be built by First Party [Sanitation Company] will be owned and operated by First Party until such time as either (a) a public district is formed to serve the area and an agreement is reached between said district and Douglass Hills Sanitation Facility, Inc. for said district to assume full responsibility for the operation of the sewage disposal plant, or (b) the Metropolitan Sewer District system is extended to the area. When the Metropolitan Sewer District system is extended to the area and the sewage disposal plant herein provided for is no longer required, the title to the plant site shall revert to the Party of the Second Part."

The disposal plant was constructed and later expanded pursuant to a special use permit from the Jefferson County Fiscal Court and a series of four permits issued by the Kentucky Water Pollution Control Commission (which has now been absorbed and replaced by the Department for Natu-

ral Resources and Environmental Protection, Division of Water Quality, hereinafter called "Natural Resources"). In connection with the original application the engineering firm representing the Sanitation Company wrote a letter to the Louisville and Jefferson County Planning and Zoning Commission stating, among other things, the following:

"The plant operation will be continuous from the time construction is completed until the proposed trunk sewer as contemplated by the Master Drainage Plan for Jefferson County is constructed to the plant site. At that time the plant operation will be discontinued and structures removed by the Douglass Hills Sanitation Facility, Inc. and the property returned to the Spring Meadows Children's Home for their use under existing zoning."

The initial construction permit issued by the Kentucky Water Pollution Control Commission did not make any reference to future abandonment of the disposal facility, but the last two permits for expansion or modification, issued in October of 1969 and June of 1971, specified that the "treatment unit in no way supersedes the need of a comprehensive sewer system, and if sewers become available, this unit must be abandoned and connection made to such system." (According to the principal representative of the developer and of the Sanitation Company, however, at this stage of events they had no alternative to accepting the permits as written.)

In due course the disposal plant was completed as the Douglass Hills subdivision was developed and marketed, and it was financed, for the most part, by a series of loans from the development corporation to the Sanitation Company. These loans were refinanced in 1971 through a loan of $200,000 from Greater Louisville First Federal Savings and Loan Association (hereinafter Greater Louisville) to the Sanitation Company, on which there was an unpaid balance of $158,000 at the time the stipulation of facts was entered in this proceeding. Meanwhile, all of the subdivision lots have been sold, the development corporation has

been dissolved, and the subdivision is now within the corporate limits of the 6th-class city of Douglass Hills.

In preparing the subdivision for sale the development corporation constructed a sewage-collection system by laying the necessary sewerage under the streets, and the purchasing lot-owners were advised that the lots were "on sewers." Under similar circumstances, when the sewage-collection system installed by a developer in its subdivision is tapped into a sewage disposal system, whether private or public, it is assumed customarily that the collection system passes to the operator of the system into which it is tapped, and thereafter that operator assumes the maintenance and upkeep of the collection system lying within the streets of the subdivision. So it was in this instance. There was never a conveyance from the development corporation to the Sanitation Company. Later, however, after the development corporation had been dissolved, the natural persons claiming to be its successors in interest with respect to any of its residuary assets executed a written instrument assigning to the Sanitation Company whatever rights they had in and to the collection system. Meanwhile, the Sanitation Company has assumed the burden of keeping the collection system in operating order, which appears thus far to have consisted principally of removing obstructions caused by foreign objects deposited into it.

A plan of the "Douglass Hills Sanitary Sewer System" was filed in this proceeding as part of a stipulation of facts. It does not show on its face whether it was recorded, but apparently it was prepared by or for the development corporation, was recorded with or referred to by the subdivision plats, and reflects the respective rights of the lot-owners and the development corporation with regard to the collection system. The following statement appears on its face:

"EASEMENT FOR SANITARY AND STORM SEWER FACILITIES

"An easement for sanitary sewers and drainage purposes is hereby reserved on,

over and under the strips of land and spaces as defined and bounded by dashed lines, marked 'sewer and drain easement,' together with right of ingress and egress over all lots to and from easements, for construction, operation and maintenance of sewers and drains over said land. No permanent structure of any kind is to be placed on, over or under the land which is subject to said easements. The easement shall be for the benefit of the land in the subdivision and other land which naturally drains therein, and said sewers and drains may be constructed by the Louisville and Jefferson County Metropolitan Sewer District, or any other public agency having legal authority for such construction, or by others subject to approval by the aforesaid sewer district."

On January 12, 1965, the Sanitation Company entered into a written agreement with Louisville Title Insurance Company guaranteeing that the Sanitation Company would provide, maintain and operate, in accordance with an adjustable schedule of rates, a sewage-collection and disposal system adequate to the needs of the Douglass Hills subdivision together with such other areas as it deemed advisable to serve, and that the system would be maintained and operated in conformity with all applicable regulations and recommendations of the Board of Health and other public authorities having jurisdiction over such matters, and in such manner as not to cause pollution in and around the area. In this agreement the Title Insurance Company purported to be acting not only in its individual capacity but also as the representative of and for the benefit of all present and future owners and occupants of the property to be served by the system, but it was further provided that no such third-party beneficiary would have any title or interest in the Sanitation Company's sewerage system, properties or facilities. The development corporation, incidentally, which installed and owned the collection system that was to be served by the disposal plant, was not a party to this instrument. The purpose of the agreement was, of course, to make the lots saleable and to protect their value.

During the following ten years or so in which the lots in Douglass Hills were sold and the city was incorporated, MSD's system of trunk lines was extended out U.S. 60 to the point at which the Sanitation Company's trunk line crosses the highway from Douglass Hills. In 1967, before MSD's facilities had become available in that area, there had been some discussion between the Sanitation Company and MSD with regard to the possible formation of a sewer subdistrict to purchase the Sanitation Company's disposal plant and operate it for the benefit of the Middletown area, including Douglass Hills, but nothing came of it. When MSD's system finally was extended into the area, MSD brought a condemnation suit in the Jefferson County Court seeking to condemn the Sanitation Company's trunk line across U.S. 60 so that the collection systems leading into it could be diverted instead into MSD's system. This action was either aborted or abandoned in favor of the instant proceeding for a declaration of rights.

In the findings of fact entered by the trial court it is recited that the Sanitation Company and its incorporators "relied upon the statements contained in the Master Plan, upon MSD's conduct in their discussions for the purchase of the treatment plant in forming their belief that when MSD was in a position to take over the treatment of sewerage [sic] in the area encompassing Douglass Hills Subdivision, MSD would acquire and pay for the system including the collection system, trunk line and treatment plant, owned by Sanitation Company." While it may be perfectly true that these parties did at some stage form such a belief, there is no evidence of any words or actions on the part of MSD that would have justified any reasonable expectation that it would not eventually infringe on the business of the Sanitation Company without buying it out. The 1964 Master Plan made no reference to future construction of treatment plants except for temporary facilities MSD itself might find it necessary to construct. The Sanitation Company's plant was not then an "existing" facility and could not possibly have been a factor

in estimating the cost of acquiring such facilities. The 1967 overtures toward forming a subdistrict to acquire and operate the Sanitation Company's plant occurred at a time when MSD had no trunk line in the area; hence they could not have been the basis for any rational hope, belief, or expectation that when MSD did have its own facilities available, and would have no use for the disposal plant, it would buy it anyway. We mention these circumstances only because of the trial court's erroneous conclusion that MSD is "estopped" to acquire the Sanitation Company's property without payment of just compensation. The obligation to pay for "property" if and when it is "taken" by a public agency is quite sufficiently guaranteed by constitutional provisions without the necessity of resorting to any theory of estoppel. As we view it, the issue of estoppel, even if it were otherwise applicable against a public agency, has no place in this litigation.

One other party in this proceeding bears specific mention. Louisville Home Federal Savings and Loan Association intervened by permission of the trial court and asserted that as the owner (through foreclosure of a mortgage) of one sewage-disposal plant and mortgagee of three others in Jefferson County it is in a position similar to that of the Sanitation Company and Greater Louisville, in that the value of its property will be lost if MSD is permitted to require its customers to utilize MSD's system instead of the private sewage-disposal facilities that are now serving them.

MSD was created by statute in 1946. Its existence and authority are prescribed by KRS 76.005 et seq. It has the right to maintain, operate, and make extensions and improvements to a comprehensive sewer and drainage system "within or without the district area" so as to provide "an effective and advantageous means of relieving the district area from inadequate sanitary and storm water drainage and from inadequate sanitary disposal and treatment of the sewage thereof," and it may "take all steps the board deems proper and necessary to effect the purposes of KRS 76.010 to 76.210." KRS 76.080(2), (3). No other person or corporation may construct, reconstruct or alter any sewers or sewage-disposal facilities in the county without approval of MSD's governing board, "in order to insure that such proposed construction, alteration or reconstruction shall conform to and be a part of a comprehensive sewer and drainage system for the said county." KRS 76.-080(12). Nor may any such facilities or extensions be started anywhere in the county until the plans have been approved by the county engineer and fiscal court of the county and by MSD. KRS 76.080(3), 76.085.

■ There can be no doubt that these statutes place the destiny of all sewer and sewage-disposal systems and facilities in Jefferson County in the iron grip of MSD. Scarcely a manhole, public or private, may be opened, closed or replaced without its approval. We think this point is important because it means that when an existing facility begins to wear out or become obsolete or otherwise inadequate MSD has the right to determine whether that facility is to be phased out of existence or be permitted to perpetuate its viability through necessary improvement or rehabilitation. Such a decision in a given instance cannot be arbitrary, of course, because Sec. 2 of our Constitution forbids the arbitrary exercise of any power, but neither must it be dictated by what is best for the financial interests of individual investors or speculators. In fine, MSD in this respect has reasonable discretion to determine what is and will be in the best interest of the public health. We do not regard the making of such a decision as an arrogation of undelegated police power, because it is specifically authorized by the statutes from which we have quoted.

■ On the other hand, the statutes contain no provision authorizing MSD unilaterally to discontinue the operation of a privately-operated sewage-disposal facility or to force its patrons to cease using it. To the contrary, the method of expansion prescribed by KRS 76.170 contemplates that the terms under which property-owners may be brought into the MSD system must

be reached by written agreement with them or, in the case of incorporated areas, with the respective municipalities in which the property is located. Only where the area has been annexed by the City of Louisville and does not yet have an adequate system may the owners be required to connect to MSD's system as it becomes available to them. KRS 76.170(2), 76.171. By contrast, KRS 220.280(2) specifically authorizes a sanitation district organized under that chapter to compel the use of its facilities. Cf. *Sanitation Dist. No. 1 of Jefferson County v. Campbell*, Ky., 249 S.W.2d 767 (1952).

The Board of Health does have the power to regulate private sewage-disposal facilities and sewer systems. KRS 212.600. It may enforce compliance with its lawful orders and regulations through resort to the contempt powers of the circuit court, and it is empowered to abate nuisances affecting the public health. KRS 212.620. In keeping with fundamental due process, however, notice and hearing are prerequisite to any such action. KRS 212.610. While much has been said and argued in this proceeding with regard to whether the Sanitation Company is or is not operating in compliance with the regulations of the Board of Health, the trial court's finding that neither it nor any other public agency has initiated thus far any action to terminate the Sanitation Company's operations is correct. Instead, in its answer the Board of Health alleges simply that the Sanitation Company is in violation of certain of its regulations and "as a consequence . . . presents a health hazard to the residents of Jefferson County." If that is so, of course, it would not have been inappropriate for the Board of Health to test its muscle in a way the statutes do not leave to the imagination.

The trial court did not make a finding of fact with reference to the Board of Health's charge that the Sanitation Company's operations constitute a health hazard, perhaps feeling that the question is not relevant in a proceeding of this nature, in which injunction relief was not demanded. Bearing in mind, however, that the essen-

tial purpose of a declaratory judgment is to set the stage for further action of one kind or another, and considering also the gravity of any situation in which the public health is threatened, we are of the opinion that the factual issue raised by this allegation is relevant and must be determined upon remand of this case to the trial court. The evidence introduced by the Board of Health does rather strongly indicate that the Sanitation Company's plant is not performing in a manner consistent with the public health and safety.

Natural Resources also has ample regulatory, remedial, and enforcement powers relating to the discharge of waste materials into the waters and streams of the Commonwealth. See. KRS 224.032 et seq. And as in the instance of the Board of Health, notice and an opportunity to be heard are prerequisite to the enforcement of its orders. KRS 224.071 et seq. So far as the record and findings indicate, these procedures have not been invoked against the Sanitation Company as yet.

We turn now to the legal status of the collection system—that is, the sewer pipes laid in the streets of Douglass Hills by the development corporation—and the rights of the lot-owners with respect to that system.

Too much time and attention have been devoted in this case to the question of who owns legal "title" to the collection system, by which we mean the corporeal title as distinguished from the easement rights owned by the lot-owners. Sometimes an incorporeal right to make free use of property "owned" by another is so broad that the subservient legal title is relatively insignificant. So it is in this instance. In both *Lee v. City of Park Hills*, Ky., 295 Ky. 383, 174 S.W.2d 539 (1943), and *Kreamer v. Harmon*, Ky., 336 S.W.2d 561 (1960), it was made perfectly clear that the abutting lot-owners have a free and unrestricted easement to use water mains laid in the streets by the developers from whom their title derives. Obviously the same principle applies to sewer mains. That being the case, the bare legal title retained by the developer has very little practical significance un-

less and until someone comes along and wants to buy it, as the City of Danville did in *Kreamer*. As a matter of fact, it probably was a gratuitous and unnecessary gesture on the part of the City of Danville, because it had been demonstrated beyond cavil in *Lee* that a new supplier of water could serve the lot-owners in the City of Park Hills without regard to the ownership of the water mains, which had been expressly retained by the developers. Exactly the same circumstance prevails here. Should the City of Douglass Hills choose to contract with MSD and leave the Sanitation Company holding the bag, as the City of Park Hills did with respect to Messrs. Lee and Simmons, the developers of that community, the *Lee* case provides an indubitable precedent for its right to do so. There is no contractual relationship whatever that binds the city or the lot-owners to continue using the services of the Sanitation Company. The Sanitation Company has no more "franchise" or exclusive right to its customers than would any other seller of services to the public. The construction of a sewage-disposal plant in reliance upon future customers is no more immune from the laws of supply and demand than is any other capital investment under the free-enterprise system.

The free use of the collection system necessarily embraces a right on the part of the lot-owners to see that it is maintained and kept in a state of good repair, either by contract with MSD or such other arrangement as they or the city may choose, should the Sanitation Company cease to do so. As we have said, the situation would be the same as in the *Lee* case after the City of Park Hills had contracted with another supplier of water services.

■ Should MSD elect to purchase the Douglass Hills collection system, as the City of Danville elected to purchase the water-distribution system in *Kreamer*, the lot-owners would own no more and no less than they own now, which is an easement, or easements, for the free use of the system. They acquired those rights when they purchased their lots, and they cannot be made to pay for them again. To the extent, however, that MSD has other capital costs that are normally allocated to its customers, this protection does not apply.

As heretofore indicated, we think the question of whether the continued operation of the Sanitation Company's disposal plant, in its existing condition, will constitute a hazard to public health and safety is an issue of fact that should be decided in this litigation. All of the interested parties are before the court. Considerable testimony has been taken, arguments made, and time consumed. All things must come to an end, and all things legal are too long. The powers of a court of equity are ample, and are equal to any exigencies that may appear or prove ·to exist. Though MSD does not have the authority to make such a decision in its own right, the trial court has the power and duty to direct a transfer of service if the public interest so ·demands.

The decision of the Court of Appeals is affirmed in part and reversed in part, and the cause is remanded to the Jefferson Circuit Court with directions for such further proceedings and judgment as are necessary to conform to this opinion.

PALMORE, C. J., and AKER, CLAYTON, LUKOWSKY, STEPHENSON and STERNBERG, JJ., sitting.

All concur.